IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Z-Man Fishing Products, Inc. and Holding One, Inc., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 2:11-cv-428-RMG-JDA |
| v. | ) ) | **REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE** |
| Joseph F. Renosky and Renosky Fishing Lures, Inc., | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

This matter is before the Court on Plaintiffs' motion for a temporary restraining order ("TRO") and expedited hearing.  [Doc. 7.]  Pursuant to the provisions of Title 28, United States Code, Section 636 and Local Rule 73.02(B)(1), D.S.C., this magistrate judge is authorized to review pre-trial motions and submit findings and recommendations to the District Court.

## BACKGROUND

Plaintiff Z-Man Fishing Products, Inc. ("Z-Man") is a privately held fishing tackle company based in Ladson, South Carolina.  [Doc. 7-2 ¶ 3.]  Z-Man is a directly owned subsidiary of Plaintiff Holding One, Inc. ("Holding One").  [*Id.* ¶ 5.]  Holding One is the owner by purchase and assignment of all right, title, and interest in two patents practiced by the CHATTERBAIT®, a line of fishing lures sold by Z-Man: (1) U.S. Patent No. 7,726,062 ("the '062 Patent") entitled "Snag-Resistant Fishing Lure" and (2) U.S. Patent No. 7,627,978 ("the '978 Patent") also entitled "Snag-Resistant Fishing Lure."  [*Id.* ¶¶ 4, 6.]  In addition, Holding One is the owner of a trade dress registration, Registration No. 3,505,384, directed toward a class of products including fishing lures.  [*Id.* ¶ 6.]  The trade

dress is a blade configuration consisting of the five unattached sides of a hexagonal blade. Registration No. 3,505,384. Z-Man is the exclusive licensee of the rights associated with the '062 Patent and the registered trade dress, and it practices both the patent and the protected trade dress in its CHATTERBAIT® series of fishing lures. [*Id.* ¶ 7.]

Defendant Joseph F. Renosky ("Renosky") is the owner and operator of Defendant Renosky Lure, Inc. ("Renosky Lure"). [Doc. 21-1 ¶ 2.] Renosky has been in the fishing lure business for many years. [*Id.* ¶ 3; Doc. 7-1 at 4.] Until December 2010, Defendants acted as the sole distributors of the CHATTERBAIT® brand lures to several retailers, including Wal-mart. [Doc. 7-2 ¶ 18; Doc. 21-1 ¶ 26.] Defendants were not granted a license to practice the '062 Patent or the registered trade dress in lure other than the CHATTERBAIT®. [*See* Doc. 7-2 ¶ 19.]

In 2011, Wal-mart ceased carrying seven stock-keeping units ("SKUs") in the CHATTERBAIT® line of fishing lures. [*Id.* ¶ 21.] Plaintiffs claim that these SKUs were replaced with lures made by Defendants that are knock-offs of Plaintiffs' CHATTERBAIT® lures that infringe the '062 Patent and Holding One's registered trade dress. [*Id.*; Doc. 7-1 at 4.] Plaintiffs complain that these knock-offs are sold at lower prices than their CHATTERBAIT® lures and are confusingly similar to their CHATTERBAIT® lures, allowing Defendants to prey upon the brand recognition and goodwill of the CHATTERBAIT® line to erode Plaintiffs' market share. [Doc. 7-2 ¶¶ 22–23, 25.]

Defendants contend that in early 2010, Renosky designed a fishing lure that has a number of advantages over the lure described in the '062 Patent. [Doc. 21-1 ¶¶ 23–24.] Defendants argue this lure does not infringe the '062 Patent because it does not contain every limitation of the allegedly infringed claim [Doc. 21 at 7], and it does not infringe

2

Holding One's registered trade dress because the trade dress is not distinctive and there is no likelihood of confusion [*Id.* at 9]. Further, Defendants contend that they did not influence Wal-mart's decision to remove the CHATTERBAIT® lures from the seven SKUs; they argue Wal-mart makes its stocking decisions based on sales performance. [Doc. 21-1 ¶¶ 30–32; Doc. 21-3 ¶ 7.]

## APPLICABLE LAW

Under the Federal Rules of Civil Procedure, a court may issue a TRO without notice to the adverse party or its attorney. Fed. R. Civ. P. 65(b). The order expires at a time set by the court, which should not exceed 14 days from the time the court enters the TRO unless there is good cause for or the adverse party consents to an extension. *Id.* If the court issues a TRO without notice to the adverse party, the motion for a preliminary injunction must be set for hearing at the earliest possible time; a preliminary injunction may not issue without notice to the adverse party. *Id.*; Fed. R. Civ. P. 65(a). The court must dissolve the TRO if the party who obtained it does not proceed with the motion for preliminary injunction at the hearing. Fed. R. Civ. P. 65(b). Further, the court may not issue a preliminary injunction nor a TRO unless the movant "gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

A preliminary injunction "protect[s] the status quo . . . to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litigation*, 333 F.3d 517, 525 (4th Cir. 2003). It is "an extraordinary remedy never awarded as of right." *Winter*

*v. Natural Res. Def. Coucil, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 376 (2008) (citing *Munaf v. Green*, 553 U.S. 674, 689–90 (2008)).  To obtain a TRO or a preliminary injunction, a plaintiff must show four elements:

    1)    he is likely to succeed on the merits,

    2)    he will suffer irreparable harm if the TRO or preliminary

              injunction is not granted,

    3)    the balance of equities favors him, and

    4)    the TRO or injunction is in the public interest.

*Winter*, 129 S. Ct. at 374; *Moore v. Kempthorne*, 464 F. Supp. 2d 519, 525 (E.D. Va. 2006) ("The standard for granting either a TRO or a preliminary injunction is the same.")*; see also Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345–47 (4th Cir. 2009) (explaining how the *Winter* standard for preliminary injunctions was different from the standard previously applied in the Fourth Circuit), *judgment vacated and remanded*, 130 S. Ct. 2371 (2010), *in light of Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876 (2010).  The plaintiff must establish all four elements to receive injunctive relief.  *Winter*, 129 S. Ct. at 374.

The Fourth Circuit explained the Supreme Court in *Winter* requires "that the plaintiff make a clear showing that it will likely succeed on the merits at trial."  *Real Truth About Obama, Inc.*, 575 F.3d at 346 (citing *Winter*, 129 S. Ct. at 374, 376).  Moreover, the party seeking the injunction must make a clear showing that it will likely suffer irreparable harm without an injunction.  *Id.* at 347 (citing *Winter*, 129 S. Ct. at 374–76).  Further, the Supreme Court in *Winter* emphasized the public interest requirement, *id.*, requiring courts

4

to "'pay particular regard for the public consequences in employing the extraordinary remedy of injunction,'" *Winter*, 129 S. Ct. at 376–77 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

## DISCUSSION

As discussed above, the same standard governs the grant of a TRO and a preliminary injunction.  *Moore*, 464 F. Supp. 2d at 525.  Because the Court has already conducted a hearing, where both parties presented arguments regarding how the TRO/preliminary injunction standard applies in this case, the Court will consider Plaintiffs' motion for a TRO to be a motion for a preliminary injunction.[1]  *See* Fed. R. Civ. P. 65.

In patent cases, "a preliminary injunction . . . involves substantive matters unique to patent law and, therefore, is governed by the law of [the Federal Circuit]."  *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988).  However, "purely procedural questions involving the grant of a preliminary injunction are controlled by the law of the appropriate regional circuit."  *Id.*  Therefore, the Court will apply Federal Circuit law with respect to substantive patent issues and Fourth Circuit law with respect to non-patent substantive issues and procedural issues.

**Likelihood of Success on the Merits**

### *Patent Infringement and Validity*

To establish a likelihood of success on the merits, a patentee must demonstrate (1) that it will likely prove that the defendant is infringing one or more claims of the patent at

---

[1] If the District Court disagrees with the Court's view of the motion as one for a preliminary injunction, and the District Court considers the motion for a TRO, the following analysis also applies to a motion for a TRO because the same standard applies to TROs and preliminary injunctions.  *See Moore*, 464 F. Supp. 2d at 525.

issue and (2) that at least one of the allegedly infringed claims will also likely withstand validity challenges presented by the defendant. *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1050 (Fed. Cir. 2010) (quoting *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001)). The Federal Circuit "views [a motion for a preliminary injunction] in light of the burdens and presumptions that will inhere at trial." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009) (noting that at trial, "an issued patent comes with a statutory presumption of validity under 35 U.S.C. § 282"). "A preliminary injunction should not issue if an alleged infringer raises a substantial question regarding either infringement or validity, i.e., the alleged infringer asserts an infringement or invalidity defense that the patentee has not shown lacks substantial merit." *AstraZeneca*, 633 F.3d at 1050 (citing *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997)).

Before it can determine whether the defendant is infringing the patent at issue or the patent is invalid, the court must construe the claims at issue, giving the claims the same meaning for purposes of both the infringement and validity analyses. *Amazon.com*, 239 F.3d at 1351 ("Only when a claim is properly understood can a determination be made whether the claim 'reads on' an accused device or method, or whether the prior art anticipates and/or renders obvious the claimed invention. . . . Because the claims of a patent measure the invention at issue, the claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses.") Then, to determine if the defendant is infringing the patent, the court compares the properly construed claims to the allegedly infringing device. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454

(Fed. Cir. 1998).  To be infringing, the defendant's device must contain every limitation, or an equivalent limitation, of the allegedly infringed claims, *see Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997), which is question of fact, *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

*Claim Construction*

Claim construction involves determining what the language of the claim means, and courts generally use three sources to determine the meaning: the claims themselves, the specification, and the prosecution history—these sources are the intrinsic evidence of a claim's meaning. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979–80 (Fed. Cir. 1995) (quoting *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed. Cir. 1991)).

Claim terms should usually be given their ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention," who is likely to read the claim term in the context of the entire patent.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  It is elementary in the law of patents that claims must be read and interpreted in the light of specifications; "specifications and claims must harmonize.  That is, we may and should turn to the specifications to see what the claims really means, and the one should not be contradictory of the other."  *Acme Card Sys. Co. v. Remington-Rand Bus. Serv.*, 3 F. Supp. 254, 255 (D. Md. 1933).  "However, in looking to the specification to construe claim terms, care must be taken to avoid reading 'limitations appearing in the specification . . . into [the] claims.'"  *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting *Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir.

1989)). "We recognize that there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). To locate that fine line, courts must look "to the specification to ascertain the meaning of the claim term as it is used by the inventor in the context of the entirety of his invention." *Id.* at 1187.

The intrinsic evidence should usually be sufficient to enable one to determine the meaning of a claim term. *See Markman*, 52 F.3d at 986 (noting that "ideally there should be no 'ambiguity' in claim language to one of ordinary skill in the art that would require resort to evidence outside the specification and prosecution history" and citing the disclosure requirements of 35 U.S.C. § 112 (1994) in support). When the intrinsic evidence is unambiguous, it is improper for the court to rely on extrinsic evidence such as expert testimony for purposes of claim construction. *Vitronics*, 90 F.3d at 1583.

When needed and in its discretion, a court may consider extrinsic evidence to determine the meaning of the language employed in the patent. *Markman*, 52 F.3d at 980 (quoting *Seymour v. Osborne*, 78 U.S. (11 Wall.) 516, 546 (1871)). Extrinsic evidence may be useful to explain scientific principles, technical terms, terms of art, and the state of the prior art at the time of the invention. *Id.* "While extrinsic evidence may be useful in shedding light on the relevant art, it is less significant than the intrinsic record in determining the 'legally operative meaning of disputed claim language.'"[2] *Bushnell, Inc.*

---

[2]The rationale for this rule is that

[t]he claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely. In other words, competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the

8

*v. Brunton Co.*, 673 F. Supp. 2d 1241, 1251 (D. Kan. 2009) (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)).   "Extrinsic evidence is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles." *Vitronics*, 90 F.3d at 1584. Prior art may also constitute extrinsic evidence.  *See id.* at 1584–85.

Dictionaries, which are a form of extrinsic evidence, hold a special place and may sometimes be considered along with the intrinsic evidence.  *Cybor*, 138 F.3d at 1459; *Vitronics*, 90 F.3d at 1584 n.6 (stating that, although technically extrinsic evidence, the court is free to consult dictionaries at any time to help determine the meaning of claim terms, "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents").   Accordingly, a court may utilize extrinsic evidence such as dictionary definitions to determine a claim's meaning as long as the extrinsic evidence does not contradict the patent documents.

### Infringement

Plaintiffs argue that Defendants' lures (the "accused device")—Plaintiffs use as an example the "J-Wills Rocker"—literally infringe Claim 1, the only independent claim of the '062 Patent, and dependent claims 2, 7, 8, and 10.  [Doc. 7-1 at 12–13.]  Defendants contend their lures do not contain every limitation of Claim 1—specifically, the limitation that the fishing lure has a body with a "wire loop fixed within," where "fixed" means "firm,

---

claimed invention.  Allowing the public record to be altered or changed by extrinsic evidence . . . , such as expert testimony, would make this right meaningless.  The same holds true whether it is the patentee or the alleged infringer who seeks to alter the scope of the claims.

*Vitronics*, 90 F.3d at 1583 (internal quotations and citations omitted).

non-movable, established, set"—therefore, Defendants claim they are not infringing Claim 1 nor any dependent claim.[3] [Doc. 21 at 7–9.] In response, Plaintiffs argue "fixed" cannot be defined as "immovable" for purposes of the '062 Patent because the '978 Patent, from which the '062 Patent is a continuation, requires the wire loop to be "immovable relative to said jig body," and under the principle of claim differentiation, "fixed" cannot mean "immovable." [Doc. 24 at 8.]

Claim 1 reads as follows:

> A fishing lure, comprising: (a) a body having a forward portion, a rearward portion, and a longitudinal axis, the forward portion defining a width; (b) **a wire loop fixed within** and extending from the forward portion of the body; (c) a hook attached to and extending rearwardly from the body along the longitudinal axis of the body, the hook having a hook end spaced apart from the rearward portion of the body; and (d) a blade member, the blade member (i) having a first edge located proximate to the wire loop and (ii) defining therethrough a mounting hole in proximity to the first edge, through which mounting hole a portion of the wire loop is positioned, and (iii) further defining therethrough a pair of line attachment holes, to which pair of line attachment holes a fishing line is attached; whereby, as the lure is pulled through the water, a majority of the blade member is oriented above the body and the blade member moves in a side-to-side motion relative to the body, the side-to-side motion being defined either by the first edge of the blade member striking a first side of the body and striking a second side of the body opposite the first side or by the first edge of the blade member striking another portion of the wire loop that is opposite the portion of the wire loop positioned through the mounting hole.

---

[3] At the hearing, the Court questioned Defendants as to whether the "wire loop fixed within" is the only limitation not present in the accused device. Defendants responded that they reserved their right to argue otherwise in the future, but for purposes of the hearing, they were only prepared to argue that their lures do not contain this one limitation.

U.S. Patent No. 7,726,062 col. 6 ll. 30–58 (filed Apr. 16, 2007) (emphasis added).  First, the Court looks to the specification to determine the meaning of "fixed within"  with respect to the wire loop.  The wire loop in the '062 Patent is also known as the eyelet (24) in Figure 1.  *Id.* fig. 1, item 24.  The eyelet (24)  is described as "extending from the jig body," *id.* col. 3, l. 42, preferably extends from a front area of the jig body, *id.* col. 3, ll.  45–46, comprises a wire loop, *id.* col. 3, l. 47, and generally is coplanar to the hook end, *id.* col. 3, ll. 48–49. Nothing in the specification specifically defines "fixed within" as used in the limitations of the language of Claim 1.  *See id.*  It is also noted that nothing in the specification limits the eyelet (24) to being immovable.  *See id.*

Next, the Court looks to the prosecution history to determine the meaning of "fixed within" in the context of Claim 1.  "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317 (citing *Vitronics*, 90 F.3d at 1582–83).  Consulting the prosecution history allows the court to "ensure[] that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers."  *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (citing *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995)).

In this case, Plaintiffs argue that they differentiated Claim 1 of the '062 Patent—containing the limitation "wire loop fixed within"—from Claim 1 of the '978 Patent—containing the limitation "an eyelet immovable relative to said jig body"—to obtain

the '062 Patent; therefore, Plaintiffs argue, the language in Claim 1 of the '062 Patent must mean something different from the language in Claim 1 of the '978 Patent. [Doc. 24 at 8.] Defendants argue that the Court should look to the definition of "fixed" to conclude that the wire loop must be immovable. [Doc. 21 at 7–9.] Upon consideration of the parties' arguments, the Court finds Defendants provide no viable argument to contradict the Plaintiffs' position.[4]

Whether construing "fixed" or "fixed within," the Court is not convinced that either term requires the restrictive limitation of being "immovable." "Fixed" according to Webster's Dictionary means "to make firm, stable or stationary; to affix or attach." Merriam Webster, http://www.merriam-webster.com/dictionary/fixed (last visited May 9, 2011). "Within" means "in or into the interior." Merriam Webster, http://www.merriam-webster.com/dictionary/within (last visited May 9, 2011). Combining the two definitions, "fixed within" would mean to make firm, stable, or stationary in or into the interior. In contrast, "immovable" means "incapable of being moved; not moving or not intended to be moved." Merriam Webster, http://www.merriam-webster.com/dictionary/immovable (last visited May 9, 2011). "Immovable," by definition, is clearly a more restrictive meaning, which Plaintiffs clearly intended in the '978 Patent but did not expressly include in the '062 Patent.

---

[4]Defendants did provide the Court with pages 9–10 of the prosecution history of the '062 Patent in which Plaintiffs distinguish their invention over Thomas, U.S. Patent No 2,291,422, by arguing that Thomas fails to teach a wire loop fixed within and extending from the forward portion of the body because Thomas' blade is connected to the body via a split ring connector, which allows a large range of motion of the blade and body relative to the other. The Court has considered Thomas and finds Defendants' argument irrelevant. Thomas specifically claims a weighted body and fish-hook fixed thereon via a split ring connector. There is no intention to be "fixed therein" as claimed in the '062 Patent. Additionally, Thomas uses the limitation "fixed" but clearly has a movable component, which works against Defendants' argument that "fixed" means "immovable."

Upon consideration of the specification, the prosecution history of the '062 Patent, and the dictionary definitions of "fixed" or "fixed within" and "immovable," the Court cannot agree with Defendants that "fixed" necessarily means "immovable."  Accordingly, it is not proper for the Court to read this limitation into the language of Claim 1.  As a result, the Court finds Plaintiffs are likely to succeed on their patent infringement claim because Plaintiffs have demonstrated the accused device contains "a wire loop fixed within" the body of the lure, and this is the only claim limitation that Defendants presently dispute.

*Validity*

Defendants counterclaim that the '062 Patent is invalid.  [Doc. 18 at 11, ¶ 11.]  At the hearing, Defendants presented only one argument that the patent is invalid; Defendants argued the '062 Patent is invalid because the hexagonal blade shape is a generic fishing lure blade shape.  The Court finds that Defendants' invalidity argument does not raise a substantial question as to Plaintiffs' likelihood of success on the merits at trial because the '062 Patent is not a patent on a hexagonal blade—it is a patent on a fishing lure comprising a blade member that has a hexagonal shape, U.S. Patent No. 7,726,062 col. 6 ll. 40, 59–60 (filed Apr. 16, 2007).  Therefore, the Court cannot find that a preliminary injunction should not issue because the Defendants raised a substantial question as to the '062 Patent's validity.  *See AstraZeneca*, 633 F.3d at 1050 ("A preliminary injunction should not issue if an alleged infringer raises a substantial question regarding . . . validity.").

13

### *Trade Dress Infringement*

In addition to protecting registered and unregistered trademarks, the Lanham Act protects trade dress,[5] which includes the total image and overall appearance of a product. *Ashley Furniture Indus., Inc. v. SanGiacomo N.A. Ltd.*, 187 F.3d 363, 368 (4th Cir. 1999) (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992)); *see also Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209 (2000) (noting that trade dress is a "category that originally included only the packaging, or 'dressing,' of a product, but in recent years has been expanded by many Courts of Appeals to encompass the design of a product"). To establish trade dress infringement, a party must demonstrate that (1) its trade dress is primarily non-functional; (2) the alleged infringement creates a likelihood of confusion; and (3) the trade dress is either inherently distinctive[6] or has acquired secondary meaning. *Two Pesos*, 505 U.S. at 769.

A certification of registration of trade dress on the principal register of trademarks is prima facie evidence of the validity of the registered trade dress. *See* 15 U.S.C. § 1057. To be registrable, the trade dress must be non-functional, *id.* § 1052(e)(5), and the trade dress must be inherently distinctive or have acquired secondary meaning, *Wal-Mart*, 529

---

[5] Trade dress is registrable under Lanham Act § 2. 15 U.S.C. § 1052; *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209 (2000). Trade dress is protected under § 43 of the Lanham Act, which creates a cause of action against "[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." *Id.* § 1125(a)(1); *see also id.* § 1125(a)(4) (establishing the burden of proof in a civil action for dilution of unregistered trade dress).

[6] Unregistered trade dress consisting of a product's design is never inherently distinctive. *Wal-Mart*, 529 U.S. at 216 (2000) ("[I]n an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, a product's design," as opposed to a product's packaging, "is distinctive, and therefore protectible, only upon a showing of secondary meaning.").

U.S. at 210–11 (citations omitted).  Therefore, a party claiming infringement of registered trade dress need only show a likelihood of confusion.

"The linchpin of both common law and federal statutory [7]trademark infringement claims is whether consumers in the relevant market confuse the alleged infringer's mark with the complainant's mark."  *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 615 (7th Cir. 1993).  The Fourth Circuit has developed a non-exclusive list of seven factors for consideration in determining whether a likelihood of confusion exists because of the alleged infringement: (1) the strength or distinctiveness of the plaintiff's mark; (2) the similarity of the two marks; (3) the similarity of the goods or services the marks identify; (4) the similarity of the facilities the two parties use in their businesses; (5) the similarity of the advertising used by the two parties; (6) the defendant's intent; and (7) actual confusion. *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir.1984).  The factors are not equally emphasized nor are all factors relevant in every case.  *Id.* (quoting *Modular Cinemas of Am., Inc. v. Mini Cinemas Corp.*, 348 F. Supp. 578, 582 (S.D.N.Y. 1972)).

Plaintiffs argue that there is a likelihood of confusion[8] because (1) their trade dress is distinctive—it is different from other blade designs on the market; (2) Plaintiffs' and Defendants' trade dress is identical or so confusingly similar that no consumer could tell the difference between the two; (3) Plaintiffs' and Defendants' goods—fishing lures—are extremely similar; (4) the similarity of Plaintiffs' and Defendants' facilities is not an

---

[8] To demonstrate a likelihood of success on the merits of their trade dress infringement claim, Plaintiffs need only demonstrate a likelihood of confusion because Plaintiffs' allegedly infringed trade dress is registered.  *See* 15 U.S.C. §§ 1052(e)(5), 1057; *Wal-Mart*, 529 U.S. at 210–11 (citations omitted).

applicable factor in this case; (5) Plaintiffs' heavily advertise and are unaware of any advertisements featuring Defendants' allegedly infringing lures; (6) Renosky acted intentionally for personal gain; and (7) consumers are actually confused.  [Doc. 7-1 at 14–17.]  Plaintiffs provided an online retailer's web page, copyrighted 2007, and posts from two online fishing forums, with posts dated 2007 and 2008, as evidence of actual consumer confusion.  [Doc. 7-4.]

Defendants contend there is no likelihood of confusion because (1) Plaintiffs' blade is not distinctive—at least ten other lures on the market utilize hexagonal blades, and Plaintiffs only provide the affidavit of Z-Man's general manager and executive vice president to establish Plaintiffs' blade is "immediately recognizable"; (2) Defendants' blade is different from Plaintiffs' because the hexagon side lengths and inside angles are different; (5)[9] Plaintiffs and Defendants do not employ similar advertising strategies, and Plaintiffs did not provide evidence of how much of Plaintiffs' advertising was directed toward the lures at issue; (6) there is no evidence that Renosky had an intent to confuse consumers; and (7) there is no evidence of any marketing source combining Defendants' name with the CHATTERBAIT® name apart from the 2007 online retailer page provided by Plaintiffs.  [Doc. 21 at 10–14.]  Defendants explain that the retailer combined "Renosky" with "Chatterbait" in 2007 because Renosky Lure was the distributor for the CHATTERBAIT® line.  [Doc. 21-1 ¶ 34.]

The Court finds that Plaintiffs are not likely to succeed on their trade dress infringement claim.  First, Plaintiffs have failed to adequately demonstrate that their trade

---

[9] Defendants do not address the third and fourth *Pizzeria Uno* factors, similarity of goods/services and similarity of facilities.

dress is distinctive.  Defendants argue there are at least ten other lures on the market utilizing a hexagonal blade.  [Doc. 21 at 10; Doc. 21-1 ¶ 16.]  Plaintiffs counter this argument by asserting that several of these ten lures do not have hexagonal blades, two producers stopped using a hexagonal blade after threats of legal action by Plaintiffs, and Plaintiffs have a suit for patent and trade dress infringement pending against another company.  [Doc. 24 at 2–3.]  However, Plaintiffs have not established through legal action that other hexagonal blades infringe Plaintiffs' trade dress.  Further, Plaintiffs have not demonstrated the popularity or extent of marketing of other hexagonal bladed lures, which may or may not still be in production.  In short, the Court finds Plaintiffs have failed to adequately prove their claim that "[c]onsumers see the *blade* of the CHATTERBAIT® and immediately recognize the product" as Plaintiffs' product.  [Doc. 7-2 ¶ 12 (emphasis added).]

Second, Plaintiffs have failed to adequately demonstrate that consumers are actually confused between Plaintiffs' trade dress and Defendants' trade dress.  While Plaintiffs produced some evidence that may indicate actual confusion, Plaintiffs' evidence is from 2007 and 2008 [Doc. 7-4], which is before Defendants began producing their allegedly infringing lures [Doc. 21-1 ¶ 23].  Moreover, Plaintiffs' evidence does not indicate consumer confusion resulting from confusingly similar trade dress—Plaintiffs' evidence demonstrates consumer confusion resulting from the distributor-distributee relationship between Z-Man and Renosky Lure.  Finally, the Court notes that actual consumer confusion over the trade dress at issue in the case, which is only the blade of the lure, is unlikely because the trade dress at issue is likely never viewed in isolation from other

17

identifying features of the Plaintiffs' and Defendants' products, such as associated trademarks, product packaging, and the lure body.

Accordingly, based on the evidence presented, the Court finds Plaintiffs are not likely to succeed on their trade dress infringement claim.

**Irreparable Harm**

Under the preliminary injunction standard articulated in *Winter*, the plaintiff must demonstrate more than the possibility of irreparable harm; the plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction." 129 S. Ct. at 375 (emphasis in original) (citing *Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983); *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 441 (1974); *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)). "[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) (citing *Merrill Lynch, Pierce, Fenner & Smith v. Bradley*, 756 F.2d 1048, 1055 (4th Cir. 1985)). However, as the Federal Circuit has stated,

> While this court has repeatedly upheld the right of a patentee to a preliminary injunction and sometimes spoken of the possible inadequacy of money damages, there is no presumption that money damages will be inadequate in connection with a motion for an injunction pendente lite. Some evidence and reasoned analysis for that inadequacy should be proffered. *See, e.g.*, *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390, 2 USPQ2d 1926, 1930 (Fed. Cir.1987) (patent owner emphasized "the few remaining years of patent life").

*Nutrition 21 v. U.S.*, 930 F.2d 867, 871–72 (Fed. Cir. 1991); *see also Hybritech*, 849 F.2d at 1456 (basing grant of preliminary injunction on ten factors that indicated the plaintiff

18

would be irreparably harmed); *MicroAire Surgical Instruments, LLC v. Arthrex, Inc.*, 726 F. Supp. 2d 604, 636–39 (W.D. Va. 2010) (finding no irreparable harm to goodwill when it was "logically and factually unclear" how introduction of a competing product would injure the plaintiff's goodwill when plaintiff did not demonstrate more than the potential for lost sales or give a reasonable basis for its conclusion that its training programs would lose value); *Bushnell*, 673 F. Supp. 2d at 1262–63 (finding irreparable harm based on the plaintiffs claims of loss of market share and price erosion because the plaintiffs provided evidence that the asserted harms were incalculable and not compensable through money damages).

Plaintiffs argue that without a preliminary injunction, they will continue to lose sales and market share, and Z-Man's goodwill will be impaired by the presence of Defendants' knock-offs.  [Doc. 7-1 at 17.]  Further, Plaintiffs contend the change in market share, price erosion, and illegal competition caused by Defendants' infringing activities cannot be corrected by money damages alone.  [*Id.* at 18.]  Plaintiffs argue price erosion is an important concern because price point plays a significant role in consumers' fishing tackle purchasing decisions.  [Doc. 7-2 ¶ 22.]  Plaintiffs further argue that because Defendants have displaced Plaintiffs' lures at Wal-mart, where consumers are shopping for the lowest price, if Defendants' lures are removed from Wal-mart after litigation of this case, consumers will not want to pay higher prices for Plaintiffs' lures if consumers are used to buying Defendants' lower priced lures, which consumers thought were the same as Plaintiffs' lures.  [Doc. 7-1 at 18.]  Finally, Plaintiffs contend that while there are several years of enforeceability remaining on the '062 Patent, the Plaintiffs' lures will never reach their earning potential if the prices continue to erode and Plaintiffs' goodwill is lost.  [*Id.*]

19

Defendants argue Plaintiffs' lost sales from the seven SKUs removed from Wal-mart are not the result of Defendants' conduct; Wal-mart decided to stop selling some of Plaintiffs' lures because those lures were not selling well. [Doc. 21 at 14.] Defendants contend that as a result of Wal-mart's independent decision to remove Plaintiffs' lures, a preliminary injunction is no guarantee that Wal-mart would fill the pegs currently occupied by Defendants' lures with Plaintiffs' lures; it is unlikely that Wal-mart would choose to replace Defendants' lures with Plaintiffs' because Wal-mart had already removed Plaintiffs' lures due to their poor sales. [*Id.* at 14–15.]

The Court finds Plaintiffs have failed to demonstrate that they will likely suffer irreparable harm without a preliminary injunction because Plaintiffs have not shown the Court any evidence of lost goodwill, loss of market share, or price erosion. While the Court agrees with Plaintiffs that these are types of harm that usually cannot be compensated through money damages, *see Multi–Channel*, 22 F.3d at 552; *Bushnell*, 673 F. Supp. 2d at 1262–63, the Court cannot conclusively determine money damages are inadequate without some evidence of inadequacy, *Nutrition 21*, 930 F.2d at 871–72. Unlike the plaintiffs in *Bushnell*, who presented affidavits stating why and how money damages were inadequate to compensate the plaintiffs for lost market share and price erosion, *Bushnell*, 673 F. Supp. 2d at 1262–63, Plaintiffs have not provided any evidence to show Plaintiffs' potential lost market share or that Plaintiffs will have to lower their prices to remain competitive.

Moreover, Plaintiffs have not demonstrated that they are likely to suffer a loss of goodwill due to the presence of Defendants' lures on the market. To the extent Plaintiffs argue their reputation will be damaged because consumers will confuse Defendants' lures

with Plaintiffs, *see MicroAire*, 726 F. Supp. 2d at 636 (defining "goodwill" to include a business's reputation) (quoting *Black's Law Dictionary* 763 (9th ed. 2009)), as discussed above, the Court is not convinced consumers are likely to confuse Plaintiffs' and Defendants' lures.  Further, the only evidence in the record as to reputation is at least neutral and at best positive as to the Defendants' reputation [*see* Doc. 21-1 ¶¶ 3–4 (Renosky has been in the fishing lure business for over 50 years, has been a long-time supplier to Wal-mart, and his products have generally performed well at retail); Doc. 7-1 at 4 ("Renosky has worked in the fishing lure business for many years.")], although Plaintiffs imply Renosky has a negative reputation as a businessman [Doc. 7-1 at 4 ("As shown in *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168 (3d Cir. 2005), [Renosky] has exploited business opportunities before.")].  Without more, the Court finds Plaintiffs have failed to meet their burden of demonstrating they are likely to suffer irreparable harm in the absence of a preliminary injunction.

**Balance of Equities**

In addition to determining the irreparable harm the plaintiff will suffer if the court does not issue a preliminary injunction, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987).  If the resulting balance favors the plaintiff, he is entitled to a preliminary injunction, provided he meets *Winter*'s three other requirements.  *Winter*, 129 S. Ct. at 374.  Here, the Court has found that Plaintiffs failed to show they will suffer irreparable harm in the absence of a preliminary injunction; therefore, the balance of equities does not favor Plaintiffs.

21

**Public Interest**

Finally, the court must "pay particular regard for the public consequences" in evaluating whether the plaintiff is entitled to a preliminary injunction. *Romero-Barcelo*, 456 U.S. at 312 (citing *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 500 (1941)). "The possession and assertion of patent rights are 'issues of great moment to the public.'" *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945) (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944)). Enforcing a valid patent against an infringer by issuing a preliminary injunction furthers public policy inherent in the patent laws, which are designed to encourage useful inventions by allowing a patentee to enjoy a limited period of market exclusivity. *Pfizer, Inc. v. Teva Pharm., USA, Inc.*, 429 F.3d 1364, 1382 (Fed. Cir. 2005) (quoting District of New Jersey's bench decision regarding grant of preliminary injunction). In this case, the Court finds a preliminary injunction would be in the public interest because the public has an interest in the enforcement of valid patents, and the Court has found that Defendants have not raised a substantial question as to the '062 Patent's validity.

## RECOMMENDATION

Wherefore, based upon the foregoing, the Court recommends that Plaintiffs' motion for a preliminary injunction be DENIED for failing to meet all four elements outlined in *Winter* for injunctive relief. In the alternative, if the District Court rejects the view that the motion should be treated as a motion for a preliminary injunction, this Court recommends that Plaintiffs' motion for a temporary restraining order be DENIED.

22

IT IS SO RECOMMENDED.

s/Jacquelyn D. Austin
United States Magistrate Judge

May 10, 2011
Greenville, South Carolina